1  Abigail V. O'Brient (SBN 265704)
   avobrient@mintz.com
2  Andrew B. Levin (SBN 290209)
   ablevin@mintz.com
3  **MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
   3580 Carmel Mountain Road, Suite 300
4  San Diego, CA 92130
   Tel:    858-314-1500
5  Fax:    858-314-1501

6  Attorneys for
   Richard M Kipperman, Chapter 11 Trustee
7

8                    UNITED STATES BANKRUPTCY COURT

9                       Southern District of California

10

11 | In re                              | Case No. 13-11672-LT11

12 | LIVE OAK HOLDING, LLC,             | Chapter 11

13 |                      Debtor.       | **DECLARATION OF RICHARD M KIPPERMAN IN SUPPORT OF MOTION**

14 | | **FOR ORDER (1) APPROVING BIDDING AND SALE PROCEDURES; (2)**

15 | | **APPROVING SALE OF WATER COMPANY AND RELATED ASSETS**

16 | | **FREE AND CLEAR OF INTERESTS, LIENS AND ENCUMBRANCES**

17 | | **PURSUANT TO 11 U.S.C. § 363(F); AND (3) GRANTING RELATED RELIEF**

18 | | Date:      February 14, 2019
19 | | Time:      10:00 a.m.
   | | Dept.:     3
20 | | Judge:     Laura S. Taylor

21

22

23

24

25

26

27

28

**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.** *(vertical sidebar)*

40810135v.2
84123663v.1

I, Richard M Kipperman, declare:

1.      I am the chapter 11 trustee of Live Oak Holding, LLC (the "Debtor"). I make this declaration in support of the Motion for Order (1) Approving Bidding and Sale Procedures; (2) Approving Sale of Water Company and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(f); and (3) Granting Related Relief (the "Sale Motion"), filed concurrently herewith.[1] I have personal knowledge of the facts stated herein, and if called as a witness, I would testify competently thereto.

2.      Through the Motion, I seek approval of the bidding and sale procedures set forth in the Motion for the sale of and authorization to sell a(a) Live Oak Springs Water Company, a water utility (the "Water Company"), (b) approximately 27 acres of real property located at 37820 Old Highway 80, Boulevard, California with APNs 609-050-03-00, 609-050-06-00, 609-086-03-00, 609-071-01-00, and 609-090-07-00 occupied by the Water Company and the improvements thereon (including groundwater wells and three 20,000 gallon water storage tanks) (the "Real Property"); and (c) all assets owned by the Water Company and/or owned by the Debtor and used by the Water Company, including, but not limited to, machinery, equipment, hardware, materials, fixtures, trade fixtures, storage units, vehicles, tools, and books and records (together with the Water Company and the Real Property, the "Assets"), to DD Axiom Resources LLC ("DD Axiom"), the stalking horse bidder, free and clear of all interests, liens, claims and encumbrances.

3.      I am aware of the following alleged interests, claims, liens and encumbrances in the Assets and intends to sell the Assets free and clear of such interests, claims, liens and encumbrances:

a.      San Diego County Treasurer-Tax Collector: The San Diego County Treasurer-Tax Collector filed a proof of claim asserting a secured claim against the Debtor's real property, including the Real Property, in the amount of $255,481.22, of which $22,325.67 is attributable to the Real Property. (Claim No. 5-1.) As of July 31, 2018, real property taxes of approximately $48,500 have been assessed against the Real Property. Any real property taxes attributable to the Real Property will be paid from the proceeds of the sale.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

40810135v.2
84123663v.1

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

4.    I have marketed the Assets as follows:

a.    Initially, in mid-2016, due to the requirement that the California Public Utilities Commission (the "CPUC") approve the sale of the Water Company, I focused my marketing efforts on existing water utilities, which could obtain approval from the CPUC on an expedited basis.  I consulted with several water utility industry associations, a consulting firm specializing in the valuation of water utilities, the CPUC, and the San Diego Department of Environmental Health regarding the most effective method for marketing the Water Company to these water utilities.  Based on my discussions with these entities, I engaged in direct marketing to several local water utilities.  Although my direct marketing resulted in extensive discussions, no water utilities ultimately made an offer to purchase the Water Company.  In addition, advertisements for the Water Company were placed in the San Diego Union Tribune, newsletters published by several industry associations, and the National Association of Bankruptcy Trustees.

b.    After these marketing efforts proved unsuccessful, I sought to retain a broker to market the Water Company.  Because I was unable to identify a broker specializing in water utilities, I decided to retain Pacific Commercial Management Inc. ("Pacific"), which had previously assisted me in the sale of other real property of the Debtor, as my real estate broker to market and sell the Assets.  Subsequently, on June 1, 2017, the Court entered an order authorizing Pacific's retention.

c.    Since its retention, Pacific continually marketed the Assets by: (a) preparing marketing materials; (b) providing due diligence materials to prospective purchasers; (c) showing the Assets to prospective purchasers; and (d) listing the Real Property on various commercial real estate websites.  Among other marketing efforts, Pacific commenced negotiations with several local water utility operators, engaged in direct marketing of the Water Company to professionals serving the water utility industry, prepared and placed an advertisement for the Water Company in the newsletter published by the American Water Works Association (which reached over 100,000 water utility professionals), and placed an advertisement for the Water Company with the Southern California Water Utilities Association.

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

-3-

40810135v.2
84123663v.1

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

d.      On or about July 3, 2018, I received an offer from DD Axiom to purchase the Assets for $175,000 (the "Original Bid").  After negotiations, I entered into an Agreement for Purchase and Sale of Assets (as amended, the "APA") with DD Axiom, a true and correct copy of which is attached hereto as **Exhibit 1**, which sets forth the terms and conditions of the Original Bid. Following the completion of due diligence, DD Axiom offered a reduced purchase price of $150,000, which I accepted (the "Stalking Horse Bid").  A true and correct copy of the amendment to the APA memorializing the price reduction is attached hereto as **Exhibit 2**.

e.      Pacific will continue to market the Water Company and the Real Property by listing the Water Company and the Real Property on various commercial real estate websites and by contacting each potential purchaser who previously expressed interest in the Water Company to inform these potential purchasers of the Bidding Procedures and Auction (as defined below).  In addition, I will list the Water Company on the website of the National Association of Bankruptcy Trustees.

5.      I believe that the marketing efforts described above are reasonable and appropriate under the circumstances, and will maximize the proceeds to the estate from the sale of the Assets.

6.      I believe that the bidding procedures, auction, and sale procedures (the "Bidding Procedures") proposed pursuant Motion and set forth in the Memorandum of Points and Authorities filed in support of the Motion to effectuate the sale of the Assets constitute the best method to maximize the proceeds from the sale of the Assets for the benefit of the Estate's creditors.

7.      I further believe that the Bidding Procedures will allow me to promptly review, analyze and compare all bids received to purchase the Assets to determine which bid is in the best interests of the Debtor's estate and creditors.  Such procedures will also increase the likelihood that the Debtor's creditors will receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process.

///

///

///

-4-

8.    I further believe that the Bidding Procedures will allow me to conduct the Auction in as efficient a manner as possible, which I believe is essential to maximizing the value of the Assets for the benefit of the Debtor's creditors.

9.    I further believe that the Bidding Procedures represent a sound exercise of my business judgment and should be approved by the Court.

10.    Prior to the hearing on the Motion, I will file a supplemental declaration setting forth the successful Bid for the Assets, whether obtained by the Auction or otherwise, and establishing the Successful Bidder's and Back-Up Bidder's good faith.

11.    I believe that the Stalking Horse Bid is consistent with the fair market value of the Assets. DD Axiom and I (with the assistance of my professionals) negotiated at arm's length the terms of the APA without any fraud or collusion. I have no prior connections to DD Axiom, and to the best of my knowledge, DD Axiom is not an insider of the Debtor.

12.    I am not aware of and does not anticipate any evidence of "self-dealing" or manipulation with regard to the Auction or generally with the sale of the Assets.

13.    To the extent any real property taxes attributable to the Real Property remain due and owing, they will be paid from the proceeds of the sale.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2019 at La Mesa, California.

Richard M Kipperman

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

-5-

# EXHIBIT 1

## AGREEMENT FOR PURCHASE AND SALE OF ASSETS

This Agreement for Purchase and Sale of Assets ("**Agreement**") is made and entered into this __24th__ day of September 2018 (the "**Effective Date**") by and between Richard M Kipperman, the chapter 11 trustee  of Live Oak Holding, LLC, a Nevada limited liability corporation ("**Seller**"), and DD Axiom Resources LLC, a California limited liability company ("**Buyer**").

## RECITALS

A.      Richard M Kipperman is the chapter 11 Trustee of Live Oak Holding, LLC (the "**Debtor**"), the debtor in Case No. 13-11672-LT11 (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the Southern District of California (the "**Bankruptcy Court**").

B.      Debtor owns Live Oak Springs Water Company, a Class D water utility providing public utility water service to approximately one hundred customers in San Diego County (the "**Water Company**") and occupying approximately 27 acres of real property located at 37820 Old Highway 80, Boulevard, California with APNs 609-050-03-00, 609-050-06-00, 609-086-03-00, 609-071-01-00, and 609-090-07-00 (the "**Real Property**").

C.      Seller desires to sell and Buyer desires to purchase the Water Company, the Real Property and the improvements thereon, and certain other assets pursuant to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual representations, covenants and promises set forth herein, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

"**Additional Deposit**" shall mean the $25,000.00 deposit to be delivered by Buyer to Escrow Agent upon expiration of the Diligence Period.

"**Agreement**" shall mean this Agreement for Purchase and Sale of Assets.

"**Approval Order**" shall mean the order entered by the Bankruptcy Court approving the sale of the Assets to Buyer free and clear of all liens, claims, and encumbrances, including all liens related to real property taxes, and approving the Lease.

"**Assets**" shall mean the Water Company, the Real Property and the improvements thereon (including groundwater wells and three 20,000 gallon water storage tanks), and all assets owned by the Water Company and/or owned by the Debtor and used by the Water Company, including, but not limited to, any and all machinery, equipment, hardware, materials, fixtures, trade fixtures, storage units, vehicles, tools, and books and records, including the information necessary to provide service to the Customers.

"**Auction**" shall mean the auction of the Assets to be held pursuant to an order entered by

the Bankruptcy Court approving procedures for the bidding on and sale of the Assets, which auction shall occur prior to the Sale Hearing.

**"Bankruptcy Case"** shall have the meaning set forth in Recital A.

**"Bankruptcy Court"** shall have the meaning set forth in Recital A.

**"Bill of Sale"** shall mean a bill of sale, in substantially the form attached or to be attached hereto as **Exhibit B**, transferring title to any Assets that constitute personal property.

**"Break-Up Fee"** shall mean an amount equal to $15,000.00.

**"Business Day"** shall mean any day other than a Saturday, Sunday or other day in which banks in Los Angeles, California are authorized or required by Law to be closed.

**"Buyer"** shall have the meaning set forth in the Preamble.

**"Closing"** shall mean the closing of the purchase and sale of the Assets pursuant to this Agreement.

**"Closing Date"** shall mean the date on which the Closing occurs, which shall be on the fifth Business Day after the later of (a) the fourteenth day following the entry of the Approval Order, or (b) the day on which the Regulatory Approval is obtained, or such other date as the Parties may agree in writing.

**"Customers"** shall mean the customers of the Water Company.

**"Debtor"** shall have the meaning set forth in Recital A.

**"Deed**" shall mean a quitclaim deed, duly executed and acknowledged by Seller, granting and conveying to Buyer fee simple title to the Real Property, in the form attached or to be attached hereto as **Exhibit A**.

**"Deposit"** shall mean the Initial Deposit plus the Additional Deposit.

**"Diligence Period"** shall have the meaning set forth in Section 2.3(a).

**"Effective Date"** shall have the meaning set forth in the Preamble.

**"Escrow Agent"** shall mean Carolyn Church of Ticor Title, located at 2275 Rio Bonito Way, Suite 160, San Diego, California 92108.

**"Final Order"** means an order of the Bankruptcy Court that (a) is with respect to a motion or application to which no opposition, objection, reservation of rights or other challenge was filed, unless such opposition, objection, reservation of rights or other challenge was withdrawn; or (b) is with respect to a motion or application to which one or more oppositions, objections, reservations of rights or other challenges were filed and were not withdrawn, and (i) has not been reversed, rescinded, stayed, modified or amended; (ii) is in full force and effect; and (iii) (A) the time to appeal or to seek review, rehearing or reconsideration, or a writ of certiorari

-2-

has expired and no appeal, request for rehearing or reconsideration, or a writ of certiorari is pending; or (B) any such appeal, request or writ has been dismissed or resolved by the highest court to which the order or judgment was timely appealed or from which review, rehearing, reconsideration or a writ of certiorari was sought.

"**Governmental Authority**" shall mean any foreign, United States federal, state or local government, political subdivision or governmental, regulatory or administrative authority, body, agency, board, bureau, commission, department, instrumentality or court, quasi-governmental authority, self-regulatory organization or stock exchange, including, but not limited to, the California Public Utilities Commission.

"**Initial Deposit**" shall mean the $15,000.00 deposit delivered by Buyer to Escrow Agent concurrently with the execution of this Agreement.

"**Interim Period**" shall mean the period commencing on the first day following expiration of the Diligence Period and continuing through and including the Closing Date.

"**Lease**" shall mean an interim operating agreement and lease for the Assets between Seller, as lessor, and Buyer, as lessee.

"**Outside Closing Date**" shall mean June 30, 2019; provided, however, that in the event that the conditions to Closing set forth in Sections 4.5(b) and 4.6(b) have not been satisfied by March 31, 2019, then the Outside Closing Date shall be September 30, 2019.

"**Party**" shall mean Buyer or Seller; "**Parties**" shall mean Buyer and Seller, collectively.

"**Proposed Sale**" shall have the meaning set forth in Section 7.2 below.

"**Purchase Price**" shall have the meaning set forth in Section 3.1(a) below.

"**Real Property**" shall have the meaning set forth in Recital B.

"**Regulatory Approval**" shall mean the approval of the transfer of ownership of the Water Company to Buyer by the California Public Utilities Commission, whether by advice letter, application, or otherwise.

"**Sale Hearing**" shall mean the hearing in the Bankruptcy Court to consider approval of the Proposed Sale.

"**Seller**" shall mean Richard M Kipperman, as chapter 11 trustee of the Debtor.

"**Third Party Consent**" shall have the meaning set forth in Section 6.8(c) below.

"**Title Company**" shall mean Ticor Title, located at 2275 Rio Bonito Way, Suite 160, San Diego, California 92108.

"**Title Policy**" shall mean the standard coverage owner's CLTA policy of title insurance issued to Seller by Title Company with respect to the Real Property.

-3-

"**Water Company**" shall have the meaning set forth in Recital B.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     <u>Sale of Assets</u>.  Subject to the terms and conditions of this Agreement and in consideration of the Purchase Price, at the Closing, Seller will sell, transfer, assign and convey to Buyer, and Buyer will purchase from Seller, the Assets.

2.2     <u>Free and Clear of Liens</u>.  The sale of the Assets by Seller, and the acquisition of the Assets by Buyer, shall be free and clear of liens, encumbrances or interests of any nature whatsoever, including all liens related to real property taxes.

2.3     <u>Diligence Period</u>.

(a)     For the sixty days following the Effective Date (or until such earlier date on which Buyer notifies Seller that its investigation pursuant to this Section 2.3 is complete) (the "**Diligence Period**"), Buyer may enter upon the Water Company, the Real Property and improvements thereon to perform, at Buyer's expense, such studies and investigations as Buyer may deem appropriate relating to Buyer's proposed acquisition of the Assets.  Buyer will use care and consideration in connection with all of its inspections and investigations of the Assets.  Buyer will schedule any entry onto the Real Property with Seller in advance, and will provide a schedule and brief explanation of all activities to be conducted on the Real Property during such entry.  All activities will be performed in compliance with all applicable laws, and in a manner which does not cause any damage in any material respect to the Assets.  Buyer agrees not to interfere with the operation and maintenance of the Assets or allow interference by any of its employees, agents or contractors.  Buyer acknowledges that Seller is in no way obligated to correct any conditions or alleged defects discovered by Buyer in the course of such investigations, studies or tests, or thereafter.  During the Diligence Period, Buyer may also conduct any investigations as Buyer deems necessary with respect to the Regulatory Approval and any other regulatory requirements.

(b)     If Buyer elects not to proceed with the purchase of the Assets, Buyer shall notify Seller in writing prior to the expiration of the Diligence Period that Buyer has elected to terminate this Agreement and thereupon the Initial Deposit and any interest accrued thereon shall be repaid to Buyer (less any escrow fees payable by Buyer pursuant to this Agreement), and this Agreement shall automatically terminate.  Seller and Buyer shall then be released from all liability or obligation hereunder, except for the obligations which survive termination of this Agreement.  If Buyer does not so notify Seller of its election to terminate this Agreement during the Diligence Period, Buyer shall be deemed to have satisfied itself as to the condition of the Assets.

(c)     Buyer will indemnify, protect, defend (with counsel reasonably satisfactory to Seller) and hold Seller harmless from and against any and all loss, expense, claim, damage and injury to person or property resulting from the presence or acts of Buyer, Buyer's employees, agents, contractors and/or subcontractors and/or the contractors or subcontractors of such agents on or about the Real Property and the Water Company in connection with the

-4-

performance of any such inspections, tests, investigations or other activities pursuant to this Section 2.3. This indemnification will survive the Closing or the termination of this Agreement. In conducting any such activities, Buyer will take all steps necessary to insure that no mechanic's or materialman's liens are recorded against the Real Property or improvements thereon with respect to such activities and will promptly remove or bond over any such liens in the event they are so recorded.

**ARTICLE III**
**PURCHASE PRICE AND PAYMENT**

3.1    Purchase Price.  The purchase price (the "**Purchase Price**") for the Assets shall be cash in the amount of $175,000.00, or such greater amount as Buyer may bid at the Auction.

3.2    Deposit.  Buyer shall deliver to Escrow Agent the Initial Deposit concurrently with the execution this Agreement.  Upon expiration of the Diligence Period, Buyer shall deliver to Escrow Agent the Additional Deposit.  At Closing, the Deposit shall be credited towards the Purchase Price.  The Initial Deposit and/or the Additional Deposit shall be nonrefundable except as set forth in Section 9.2 below.

3.3    Closing Date Payment.  On the Closing Date, Buyer will deliver, or cause to be delivered, as consideration for the Assets, by wire transfer of immediately available funds to the Escrow Agent, the Purchase Price less the amount of the Deposit actually delivered by Buyer to the Escrow Agent.

**ARTICLE IV**
**CLOSING**

4.1    Closing.  The closing of the purchase and sale of the Assets (the "**Closing**") will take place at 10:00 a.m. on the Closing Date, at the offices of Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., 3580 Carmel Mountain Road, Suite 300, San Diego, CA 92130, or at such other time and place as the Parties may agree in writing prior to the Closing Date.

4.2    Possession.  At Closing, possession of the Real Property and improvements thereon shall be delivered to Buyer free and clear of all tenants and occupants.

4.3    Seller's Deliveries at Closing.  At the Closing, Seller shall deliver the following to the Escrow Agent:

(a)    The Approval Order, which shall be a conformed copy if required by the Escrow Agent;

(b)    The Deed;

(c)    The Bill of Sale;

(d)    Such documents as may reasonably be required by the Title Company to issue the Title Policy;

-5-

(e)     All keys and combinations in Seller's possession to all locks on the Real Property;

(f)     Possession of the Assets;

(g)     A notice to Customers that the Water Company has been transferred by Seller to Buyer and instructing Customers to pay any and all charges for Water Company service provided from and after the Interim Period or the Closing (depending upon the date the Regulatory Approval is obtained) directly to Buyer or as otherwise directed by Buyer; and

(h)     Such other duly executed documents, instruments and certificates as may be necessary or appropriate to be delivered by Seller pursuant to this Agreement.

4.4     Buyer's Deliveries at Closing. At the Closing, Buyer shall deliver the following to the Escrow Agent:

(a)     The Purchase Price less the amount of the Deposit actually delivered to Seller and/or Escrow Agent prior to the Closing Date;

(b)     An officer's certificate, dated as of the Closing date, executed by the managing member of Buyer certifying that the conditions set forth in Section 4.5(c) and (e) have been satisfied;

(c)     A Preliminary Change of Ownership Report and any required transfer tax statements;

(d)     The Regulatory Approval, in such form as Escrow Agent may request; and

(e)     Such other duly executed documents, instruments and certificates as may be necessary or appropriate to be delivered by Seller pursuant to this Agreement.

4.5     Seller's Conditions to Closing.  Seller's obligations to transfer the Assets to Buyer shall be subject to the following conditions precedent:

(a)     The Bankruptcy Court shall have entered the Approval Order and the Approval Order shall not be stayed or reversed.

(b)     The Regulatory Approval shall have been obtained and there shall be no suit, action, litigation, arbitration or governmental proceeding or audit, including appeals and applications for review, in progress, pending, or threatened with respect to the Regulatory Approval, or any judgment, decree, injunction, deficiency, rule or order of any court, Governmental Authority, commission, agency, instrumentality or arbitrator with respect to the Regulatory Approval.

(c)     Each of the representations of Buyer shall be true and correct in all respects as of the date hereof, and shall be true and correct in all respects on the Closing Date.

(d)     Buyer shall have delivered to the Escrow Agent the items required in Section 4.4.

(e)     Buyer shall have performed and observed all material covenants and agreements of this Agreement to be performed and observed by Buyer as of the Closing Date.

(f)     No action shall have been commenced by or before any Governmental Authority against Buyer, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement which, in the reasonable, good faith determination of Seller, is likely to render it impossible or unlawful to consummate such transactions.

(g)     No court or other Governmental Authority shall have issued an order or stay pending appeal which shall then be in effect restraining or prohibiting the completion of the transactions contemplated hereby or reversing the Approval Order or the Regulatory Approval.

4.6     <u>Buyer's Conditions to Closing</u>.  Buyer's obligations to purchase the Assets from Seller shall be subject to the following conditions precedent:

(a)     The Bankruptcy Court shall have entered the Approval Order and the Approval Order shall not be stayed or reversed.

(b)     The Regulatory Approval shall have been obtained and there shall be no suit, action, litigation, arbitration or governmental proceeding or audit, including appeals and applications for review, in progress, pending, or threatened with respect to the Regulatory Approval, or any judgment, decree, injunction, deficiency, rule or order of any court, Governmental Authority, commission, agency, instrumentality or arbitrator with respect to the Regulatory Approval.

(c)     Seller shall have delivered to the Escrow Agent all of the items required in Section 4.3.

(d)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

(e)     Seller shall have performed and observed all material covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

(f)     The Title Company shall have issued or shall be committed to issue the Seller's Title Policy.

4.7     <u>Closing Costs</u>.  Each Party shall bear its own attorneys' fees and other costs relating to this Agreement, except as set forth below:

(a)     <u>Seller's Transaction Costs</u>.  Seller shall pay for the following items in connection with the transactions contemplated by this Agreement:  (a) one-half of the fees and expenses for Escrow Agent; (b) all transfer taxes or similar taxes levied by any Governmental Authority attributable to the transfer of the Assets, including all filing fees, recording, transfer or

conveyance taxes payable in connection with the conveyance of the Assets; and (c) the title insurance premium for the Title Policy.

(b)      Buyer's Transaction Costs.  Buyer shall pay for the following items in connection with the transactions contemplated by this Agreement:  (a) one-half of the fees and expenses for Escrow Agent; (b) the cost of any due diligence Buyer chooses to conduct; (c) all costs related to the Regulatory Approval; and (d) any fees, commissions or expenses of any broker retained by Buyer.

4.8      Pre-Closing Actions of Buyer and Seller.  Each Party shall notify the other Party immediately in writing of any fact or condition that causes or constitutes a breach of either Party's representations, warranties or covenants under this Agreement.  Such disclosure shall not change or alter any obligation of the disclosing Party under this Agreement.

4.9      Prorations and Allocations.  Certain revenues, expenses and other items with respect to the Assets, and applicable to the periods of time before and after the Interim Period and/or the Closing (depending on the date the Regulatory Approval is obtained), determined in accordance with sound accounting principles consistently applied, shall be prorated and allocated between Seller and Buyer as provided herein. Except as provided to the contrary herein, Seller shall be entitled to all revenue and shall be responsible for all expenses for the period of time up to but not including the Closing Date (except as otherwise provided in the Lease), and Buyer shall be entitled to all revenue and shall be responsible for all expenses for the period of time from and after and including the Closing Date (except as otherwise provided in the Lease).

(a)      Customer payments for services provided shall be prorated as of the Closing Date (except as otherwise provided in the Lease).

(b)      Except as otherwise provided in the Lease, utility charges (including, but not limited to, charges for telephone, cellular telephone, internet, sewer and electricity) shall be prorated as of Closing Date except to the extent the Parties can arrange for the utility providers to read meters on the Closing Date, in which event Seller shall pay all outstanding utility charges through the time the meters are read and there shall be no proration of utilities.

(c)      Except as otherwise provided in the Lease, ordinary course expenses of the Water Company (including monthly fees of the licensed operator of the Water Company (i.e., $750.00 per month)), employee wages, payroll taxes, payroll expenses and repairs) shall be prorated as of the Closing Date.

If accurate prorations and allocations cannot be made at Closing or during the Interim Period because, for example, current bills are not obtainable (as, for example, in the case of utility bills and/or real estate taxes), the Parties shall allocate or prorate such items at Closing using the best available information, subject to adjustment upon receipt of the final bill or other evidence of the applicable revenue or expense.  The obligation to make the adjustment shall survive the Closing.  Except as otherwise provided in the Lease, an adjustment to prorations and allocations shall be completed within one hundred and eighty days after the Closing Date in the manner described herein and the Parties shall promptly pay or reimburse any final amounts due.

-8-

## ARTICLE V
## COVENANTS, REPRESENTATIONS AND WARRANTIES OF SELLER

To induce Buyer to enter into this Agreement and to purchase the Assets, Seller makes the following representations, warranties and covenants with respect to the Assets:

5.1     Authority.  Subject to entry of the Approval Order and the issuance of the Regulatory Approval, Seller has all requisite right, power and authority to execute and deliver this Agreement and to perform his obligations under this Agreement.

5.2     Enforceability.  This Agreement constitutes the legal, valid and binding obligation of Seller, subject to Bankruptcy Court approval and the issuance of the Regulatory Approval.  If the Bankruptcy Court fails to approve this Agreement or the transactions contemplated thereby, the Approval Order does not become a Final Order, and/or the Regulatory Approval is not obtained, this Agreement shall have no force and effect and Seller shall have no obligations or liability to Buyer.  Richard M Kipperman is entering into this Agreement solely in his capacity as the chapter 11 trustee of the Debtor and as Seller, and not in his personal capacity, and no obligations or liability shall accrue to Richard M Kipperman personally in connection with this Agreement or the transactions contemplated thereby.

5.3     No Other Representations or Warranties.  Except for the representations, warranties and covenants of Seller expressly contained herein, neither Seller nor its representatives makes any other express or implied warranty (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose) on behalf of Seller, including, without limitation, (a) the probable success or profitability of ownership, use or operation of the Assets by Buyer after the Closing or during the Interim Period, (b) the probable success or results in connection with the Bankruptcy Court, the Approval Order and/or the Regulatory Approval, or (c) the value, use or condition of the Assets, which are being conveyed hereby on an "As Is", "Where Is" condition (as further set forth below in Article X), without any warranty whatsoever (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose).

## ARTICLE VI
## COVENANTS, REPRESENTATIONS AND WARRANTIES OF BUYER

To induce Seller to enter into this Agreement and to sell the Assets, Buyer represents and warrants to Seller, which representations and warranties shall survive the Closing, as follows:

6.1     Organization and Qualification.  Buyer is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Subject to the Regulatory Approval, Buyer has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the operation of the Water Company) as it is now being conducted.

6.2     Authority.  Buyer represents that has all requisite right, power and authority to execute and deliver this Agreement and each of the documents to be delivered pursuant to this Agreement, and to perform its obligations under this Agreement and each of the documents to be delivered pursuant to this Agreement.  Buyer's execution and delivery of this Agreement and

each of the documents to be delivered pursuant to this Agreement, the performance of Buyer's obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary actions on the party of Buyer.

6.3     Enforceability.  This Agreement constitutes the legal, valid and binding obligation of Buyer, generally enforceable against Buyer in accordance with its terms.

6.4     No Violation.  Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated hereby by Buyer will constitute a violation of (a) any rule, regulation, order, judgment or decree of any court or of any Governmental Authority, (b) any of Buyer's organizational documents, (c) any contract or agreement, (d) any writ, order, judgment, decree, law, rule, regulation or ordinance, or (e) any other commitment or restriction by which Buyer is bound.

6.5     Pending Litigation.  There is no litigation, arbitration or administrative proceeding pending or threatened (including condemnation or taking by eminent domain) which could affect Buyer's ability to carry out its obligations hereunder.

6.6     No Broker.  No person or entity has acted, directly or indirectly, as a broker, finder or advisor for Broker.  Seller is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement or contract made by or on behalf of Buyer.

6.7     Eligibility for Regulatory Approval.  There is no reason which would prevent Buyer from being able to qualify for and obtain the Regulatory Approval.

6.8     Covenants of Buyer.  Buyer agrees as follows:

(a)     During the period between the execution of this Agreement and the Closing, Buyer will promptly notify Seller in writing of any event that would render any representation or warranty of Buyer contained in this Agreement, if made on or as of the date of that event or the Closing, untrue or inaccurate in any material respect.

(b)     During the period between the execution of this Agreement and the Closing, Buyer will use its best efforts to satisfy or cause to be satisfied all the conditions precedent to the Closing hereunder, and to cause the transactions contemplated hereby to be consummated.

(c)     Seller is conveying to Buyer all right, title and interest in and to certain Assets which may require the consent of third-parties to effect the assignment (each a "**Third Party Consent**"), including business information related to the Customers, which may be subject to certain privacy and other protections.  Including with respect to Buyer's access to and use of such information during the Interim Period, Buyer (i) shall be responsible for (A) ensuring the transfer of such information complies with applicable law; and (B) investigating the need for any such Third Party Consent with respect to the Assets; (ii) shall bear the burden and expense of obtaining such Third Party Consents; and (iii) shall maintain the confidentiality of any Customer information subject to privacy or other protections to the extent required by applicable law.

-10-

Seller can provide no assurance that any such Third Party Consent can be obtained. Buyer will indemnify, protect, defend (with counsel reasonably satisfactory to Seller) and hold Seller harmless from and against any and all loss, expense, claim, damage and injury to person or property resulting from the transfer or use of the Customer information, or Buyer's access thereto. This indemnification will survive the Closing or the termination of this Agreement.

6.9     Survival of Representations and Warranties. The covenants, representations and warranties of Buyer set forth in this Article VI will survive until nine months after the Closing Date, after which time they will be void and of no force or effect, unless, prior to the date that is nine months after the Closing Date, Seller shall have notified Buyer of a breach of such representation or warranty. In such event, the covenant, representation or warranty that is the subject of the claim shall survive until the parties have resolved the claim or the claim is disposed of by a final non-appealable judgment by legal proceeding or settlement.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL SUBJECT TO OVERBID

7.1     Bankruptcy Court Approval. This Agreement and the sale of the Assets as described herein shall be presented for approval to the Bankruptcy Court, subject to overbid. The sale by Seller to Buyer shall be a sale of the Assets free and clear of liens, claims, encumbrances and interests, including liens related to real property taxes, to the fullest extent provided by the United States Bankruptcy Code. All of Seller's obligations under this Agreement and the Closing shall be conditioned upon the entry of the Approval Order.

7.2     Sale Procedures. Following the conclusion of the Diligence Period, Seller shall file a motion that seeks the entry of an order approving, among other things, the procedures in connection with (a) Seller's request to sell and assign the Assets to Buyer pursuant to this Agreement free and clear of liens, claims, encumbrances and interests, including liens related to real property taxes, to the fullest extent provided by the United States Bankruptcy Code (the "**Proposed Sale**"); (b) establishing notice requirements of the Proposed Sale and the Sale Hearing; (c) establishing a deadline for the submission of competing bids for the Assets; (d) establishing thresholds of (i) $25,000.00 for the initial overbid and (ii) $5,000.00 for each subsequent overbid; (e) approving the Break-Up Fee; and (f) setting a date for the Auction and the Sale Hearing.

## ARTICLE VIII
## REGULATORY APPROVAL AND OPERATION OF WATER COMPANY PRIOR TO CLOSING

8.1     Regulatory Approval. Following entry of the Approval Order, this Agreement and the sale of the Assets as described herein shall be presented for approval to all necessary Governmental Authorities, including the California Public Utilities Commission. All of Seller's obligations under this Agreement and the Closing shall be conditioned upon obtaining the Regulatory Approval.

8.2    <u>Regulatory Approval Cooperation</u>.  Buyer and Seller shall use best efforts to obtain the Regulatory Approval and shall assist and cooperate with each other and their respective representatives in obtaining the Regulatory Approval.

8.3    <u>Conduct of Business</u>.  During the Interim Period, Buyer shall take possession of the Assets and shall operate the Water Company in accordance with the terms of the Lease, which Lease shall be negotiated and executed by the Parties during the Diligence Period.  In the event the Regulatory Approval is not obtained by the Outside Closing Date or the Court refuses to approve the Proposed Sale, the Parties shall have the right to terminate the Lease in accordance with the terms thereof.

**ARTICLE IX**
**<u>TERMINATION</u>**

9.1    <u>Events of Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by Seller if a material breach of any provision of this Agreement has been committed by Buyer and the breach has not been waived or cured prior to termination;

(b)    by Buyer if a material breach of any provision of this Agreement has been committed by Seller and the breach has not been waived or cured prior to termination;

(c)    by Buyer, if any condition in Section 4.6 has not been satisfied by the Closing, other than through the failure of Buyer to comply with its obligations under this Agreement;

(d)    by Seller, if any condition in Section 4.5 has not been satisfied by the Closing, other than through the failure of Seller to comply with his obligations under this Agreement;

(e)    by either Party, if an alternative transaction is approved by the Bankruptcy Court;

(f)    by either Party, if the Regulatory Approval is not obtained; provided, however, that Buyer may not terminate pursuant to this Section 9.1(f) if the failure to obtain such Regulatory Approval is the result of Buyer's withdrawal of or failure to prosecute diligently any applications and/or timely provide other documents or information required to obtain the Regulatory Approval;

(g)    by Seller, if the Closing has not occurred by the Outside Closing Date;

(h)    by Buyer, during the Diligence Period, as set forth in Section 2.3;

(i)    by Seller, if the Diligence Period has expired and Buyer has failed to deliver the Additional Deposit;

-12-

(j)    by Seller, if Buyer materially breaches its obligations under the Lease during the Interim Period;

(k)    by Seller, if Buyer fails to enter into the Lease during the Diligence Period; or

(l)    by the mutual consent of both Parties.

9.2    Effects of Termination.

(a)    In the event that this Agreement shall be terminated pursuant to Section 9.1 above, all further obligations of the Parties under this Agreement shall terminate without further liability or obligation of any Party to any other Party hereunder except for those provisions that expressly survive the termination of this Agreement; provided that no Party shall be released from liability hereunder, subject to the express provisions of this Agreement, if this Agreement is terminated and the transactions abandoned by reason of (a) failure of such Party to have performed its obligations hereunder; or (b) any knowing misrepresentations made by such Party of any matter set forth herein. Upon any termination hereunder, Seller shall promptly release the portion of the Deposit actually delivered to the Escrow Agent, plus any accrued interest thereon, to Buyer; provided, however, that in the event that this Agreement is terminated pursuant to Section 9.1(a), (d), (f) or (j) (solely, in the case of Section 9.1(f), if the failure to obtain the Regulatory Approval is the result of Buyer's withdrawal of or failure to prosecute diligently any applications and/or timely provide other documents or information required to obtain the Regulatory Approval), Seller shall be entitled to retain the Deposit, plus any accrued interest thereon, as liquidated damages in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Agreement by Buyer; and further provided, however, that in the event that this Agreement is terminated pursuant to Section 9.1(i), Seller shall be entitled to retain the Initial Deposit, plus any accrued interest thereon, as liquidated damages in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Agreement by Buyer.

Seller and Buyer have each initialed below to further indicate their awareness and acceptance of each and every provision of Section 9.2(a).

_____                    _____
Buyer's Initials                                             Seller's Initials

(b)    In the event that this Agreement is terminated by Buyer pursuant to Sections 9.1(b), 9.1(c) or 9.1(e), the Seller shall pay Buyer the Break-Up Fee no later than five Business Days after the date of such termination.

9.3    Notice of Termination.  Notice of termination shall be given by the terminating Party to the other Party as provided in Section 11.8.

9.4    Survival.  This Article IX shall survive any termination of this Agreement.

-13-

(j)     by Seller, if Buyer materially breaches its obligations under the Lease during the Interim Period;

(k)     by Seller, if Buyer fails to enter into the Lease during the Diligence Period; or

(l)     by the mutual consent of both Parties.

9.2     Effects of Termination.

(a)     In the event that this Agreement shall be terminated pursuant to Section 9.1 above, all further obligations of the Parties under this Agreement shall terminate without further liability or obligation of any Party to any other Party hereunder except for those provisions that expressly survive the termination of this Agreement; provided that no Party shall be released from liability hereunder, subject to the express provisions of this Agreement, if this Agreement is terminated and the transactions abandoned by reason of (a) failure of such Party to have performed its obligations hereunder; or (b) any knowing misrepresentations made by such Party of any matter set forth herein.  Upon any termination hereunder, Seller shall promptly release the portion of the Deposit actually delivered to the Escrow Agent, plus any accrued interest thereon, to Buyer; provided, however, that in the event that this Agreement is terminated pursuant to Section 9.1(a), (d), (f) or (j) (solely, in the case of Section 9.1(f), if the failure to obtain the Regulatory Approval is the result of Buyer's withdrawal of or failure to prosecute diligently any applications and/or timely provide other documents or information required to obtain the Regulatory Approval), Seller shall be entitled to retain the Deposit, plus any accrued interest thereon, as liquidated damages in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Agreement by Buyer; and further provided, however, that in the event that this Agreement is terminated pursuant to Section 9.1(i), Seller shall be entitled to retain the Initial Deposit, plus any accrued interest thereon, as liquidated damages in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Agreement by Buyer.

Seller and Buyer have each initialed below to further indicate their awareness and acceptance of each and every provision of Section 9.2(a).

_____          _____
Buyer's Initials                                  Seller's Initials

(b)     In the event that this Agreement is terminated by Buyer pursuant to Sections 9.1(b), 9.1(c) or 9.1(e), the Seller shall pay Buyer the Break-Up Fee no later than five Business Days after the date of such termination.

9.3     Notice of Termination.  Notice of termination shall be given by the terminating Party to the other Party as provided in Section 11.8.

9.4     Survival.  This Article IX shall survive any termination of this Agreement.

-13-

## ARTICLE X
## AS-IS TRANSACTION

10.1  **"AS IS" SALE; DISCLAIMERS; RELEASE.  IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

**BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL, CONVEY AND ASSIGN TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS."  BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN.  BUYER HEREBY ACKNOWLEDGES THAT NO SUCH WARRANTIES, GUARANTEES, STATEMENTS OR REPRESENTATIONS HAVE BEEN MADE. BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."**

**BUYER ACKNOWLEDGES TO SELLER THAT, PRIOR TO CLOSING, BUYER WILL HAVE HAD THE OPPORTUNITY TO CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ASSETS AND ITS ACQUISITION THEREOF.  BUYER FURTHER WARRANTS AND REPRESENTS TO SELLER THAT BUYER WILL RELY SOLELY ON ITS OWN REVIEW AND OTHER INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND NOT UPON THE INFORMATION PROVIDED BY OR ON BEHALF OF SELLER, OR ITS AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT THERETO.  BUYER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, LATENT OR PATENT DEFECTS, ADVERSE PHYSICAL, REGULATORY OR OTHER ADVERSE MATTERS, MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS.**

**SELLER SPECIFICALLY DISCLAIMS, AND NEITHER SELLER NOR ANY OF SELLER'S REPRESENTATIVES, AGENTS NOR ANY OTHER PERSON IS MAKING, ANY REPRESENTATION, WARRANTY OR ASSURANCE WHATSOEVER TO BUYER, AND NO WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EITHER EXPRESS OR IMPLIED, ARE MADE BY SELLER OR RELIED UPON BY BUYER WITH RESPECT TO THE STATUS OF TITLE TO OR THE MAINTENANCE, REPAIR, CONDITION, DESIGN OR MARKETABILITY OF**

-14-

**THE ASSETS, OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO (i) ANY CLAIM BY BUYER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN, WITH RESPECT TO THE ASSETS, (ii) THE FINANCIAL CONDITION OR PROSPECTS OF THE ASSETS AND (iii) THE COMPLIANCE OR LACK THEREOF OF THE ASSETS WITH GOVERNMENTAL REGULATIONS, INCLUDING WITHOUT LIMITATION ENVIRONMENTAL LAWS AND ZONING REQUIREMENTS, NOW EXISTING OR HEREAFTER ENACTED OR PROMULGATED, IT BEING THE EXPRESS INTENTION OF SELLER AND BUYER THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE ASSETS WILL BE CONVEYED AND TRANSFERRED TO BUYER IN THEIR PRESENT CONDITION AND STATE OF REPAIR, "AS IS, WHERE IS, WITH ALL FAULTS". IN ADDITION, SELLER MAKES NO REPRESENTATIONS, WARRANTIES, PROMISES OR GUARANTIES REGARDING THE LIKELIHOOD THAT THE APPROVAL ORDER WILL BE ENTERED OR THE REGULATORY APPROVAL WILL BE OBTAINED.  BUYER REPRESENTS THAT IT IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED BUYER OF REAL ESTATE AND OTHER ASSETS, AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF BUYER'S CONSULTANTS IN PURCHASING THE ASSETS.  BUYER HAS BEEN GIVEN A SUFFICIENT OPPORTUNITY TO CONDUCT AND HAS CONDUCTED SUCH INSPECTIONS, INVESTIGATIONS AND OTHER INDEPENDENT EXAMINATIONS OF THE ASSETS AND RELATED MATTERS AS BUYER DEEMS NECESSARY, INCLUDING BUT NOT LIMITED TO THE PHYSICAL, REGULATORY AND ENVIRONMENTAL CONDITIONS THEREOF, AND WILL RELY UPON SAME AND NOT UPON ANY STATEMENTS OF SELLER NOR OF ANY BROKER, REPRESENTATIVE, EMPLOYEE, AGENT OR ATTORNEY OF SELLER.  BUYER ACKNOWLEDGES THAT ALL INFORMATION OBTAINED BY BUYER WAS OBTAINED FROM A VARIETY OF SOURCES, AND SELLER WILL NOT BE DEEMED TO HAVE REPRESENTED OR WARRANTED THE COMPLETENESS, TRUTH OR ACCURACY OF ANY OF THE DOCUMENTS OR OTHER SUCH INFORMATION HERETOFORE OR HEREAFTER FURNISHED TO BUYER.  UPON THE CLOSING, BUYER WILL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL, REGULATORY AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INSPECTIONS AND INVESTIGATIONS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS COLLATERAL TO OR AFFECTING THE ASSETS BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN.  BUYER, WITH BUYER'S COUNSEL, IF ANY, HAS FULLY REVIEWED THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS AGREEMENT AND UNDERSTANDS THE SIGNIFICANCE OF EACH AND AGREES THAT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH HEREIN ARE AN INTEGRAL PART OF THIS AGREEMENT, AND THAT SELLER WOULD NOT**

-15-

HAVE AGREED TO SELL THE ASSETS TO BUYER FOR THE PURCHASE PRICE WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN THIS AGREEMENT.

BUYER COVENANTS AND AGREES ON BEHALF OF ITSELF AND ITS SUCCESSORS AND ASSIGNS NOT TO SUE SELLER AND RELEASES SELLER OF AND FROM AND WAIVES ANY CLAIM OR CAUSE OF ACTION, INCLUDING WITHOUT LIMITATION ANY STRICT LIABILITY CLAIM OR CAUSE OF ACTION, FOR ANY LOSS, COST, DAMAGE, EXPENSE OR OTHER OBLIGATION OR LIABILITY THAT BUYER OR ITS SUCCESSORS OR ASSIGNS MAY HAVE AGAINST SELLER, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN,  THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY CONNECTED WITH THE DESIGN, PHYSICAL, STRUCTURAL, REGULATORY OR ENVIRONMENTAL CONDITION OF THE ASSETS OR OPERATIONS OR PERFORMANCE OF THE ASSETS.  THE TERMS AND CONDITIONS OF THIS ARTICLE X WILL EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT OR THE CLOSING, AS THE CASE MAY BE, AND WILL NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND ARE HEREBY DEEMED INCORPORATED INTO THE DEED AND BILL OF SALE AS FULLY AS IF SET FORTH AT LENGTH THEREIN. THIS RELEASE INCLUDES CLAIMS OF WHICH BUYER IS PRESENTLY UNAWARE OR WHICH BUYER DOES NOT PRESENTLY SUSPECT TO EXIST WHICH, IF KNOWN BY BUYER, WOULD MATERIALLY AFFECT BUYER'S RELEASE OF SELLER.

BUYER SPECIFICALLY WAIVES THE PROVISION OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Seller and Buyer have each initialed this Article X below to further indicate their awareness and acceptance of each and every provision of this Article X.

_____          _____
Buyer's Initials                                          Seller's Initials

### ARTICLE XI
### MISCELLANEOUS

11.1    <u>Representation of Comprehension of Document</u>.  The Parties represent and warrant that they have each read this Agreement and are fully aware of and understand all of its terms.  The Parties represent that they have consulted with, and have received advice from, independent legal counsel in connection with their review and execution of this Agreement, or have had the opportunity to consult with legal counsel and have declined to do so.

79356564v.4

HAVE AGREED TO SELL THE ASSETS TO BUYER FOR THE PURCHASE PRICE WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN THIS AGREEMENT.

BUYER COVENANTS AND AGREES ON BEHALF OF ITSELF AND ITS SUCCESSORS AND ASSIGNS NOT TO SUE SELLER AND RELEASES SELLER OF AND FROM AND WAIVES ANY CLAIM OR CAUSE OF ACTION, INCLUDING WITHOUT LIMITATION ANY STRICT LIABILITY CLAIM OR CAUSE OF ACTION, FOR ANY LOSS, COST, DAMAGE, EXPENSE OR OTHER OBLIGATION OR LIABILITY THAT BUYER OR ITS SUCCESSORS OR ASSIGNS MAY HAVE AGAINST SELLER, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN,  THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY CONNECTED WITH THE DESIGN, PHYSICAL, STRUCTURAL, REGULATORY OR ENVIRONMENTAL CONDITION OF THE ASSETS OR OPERATIONS OR PERFORMANCE OF THE ASSETS.  THE TERMS AND CONDITIONS OF THIS ARTICLE X WILL EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT OR THE CLOSING, AS THE CASE MAY BE, AND WILL NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND ARE HEREBY DEEMED INCORPORATED INTO THE DEED AND BILL OF SALE AS FULLY AS IF SET FORTH AT LENGTH THEREIN. THIS RELEASE INCLUDES CLAIMS OF WHICH BUYER IS PRESENTLY UNAWARE OR WHICH BUYER DOES NOT PRESENTLY SUSPECT TO EXIST WHICH, IF KNOWN BY BUYER, WOULD MATERIALLY AFFECT BUYER'S RELEASE OF SELLER.

BUYER SPECIFICALLY WAIVES THE PROVISION OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

'A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Seller and Buyer have each initialed this Article X below to further indicate their awareness and acceptance of each and every provision of this Article X.

_____                _____
Buyer's Initials                                    Seller's Initials

## ARTICLE XI
## MISCELLANEOUS

11.1    Representation of Comprehension of Document.  The Parties represent and warrant that they have each read this Agreement and are fully aware of and understand all of its terms.  The Parties represent that they have consulted with, and have received advice from, independent legal counsel in connection with their review and execution of this Agreement, or have had the opportunity to consult with legal counsel and have declined to do so.

-16-

11.2 <u>Merger and Modification</u>. This Agreement, including the Exhibits hereto, contains the entire understanding of the Parties hereto with respect to the subject matter hereof, and there are no other agreements modifying its terms. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.

11.3 <u>Amendment</u>. This Agreement may be amended, changed, altered or modified only by an amendment in writing signed by both Parties.

11.4 <u>Governing Law</u>. The Parties acknowledge and agree that the conditions, validity and enforceability of any terms or provisions of this Agreement shall be determined by the laws of the State of California and the United States Bankruptcy Code.

11.5 <u>Venue</u>. The Bankruptcy Court will have exclusive jurisdiction over any and all disputes between or among the Parties, whether in law or equity, arising out of or relating to this Agreement and/or any transactions contemplated hereby; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such dispute, the courts of the State of California, County of San Diego and the federal courts located in the State of California, County of San Diego will have exclusive jurisdiction over any and all disputes between or among the parties, whether in law or equity, arising out of or relating to this Agreement and/or any transactions contemplated hereby. Each of the Parties hereto hereby irrevocably waives any and all rights to trial by jury in any legal proceeding arising out of or related to this Agreement or the transactions contemplated hereby.

11.6 <u>Interpretation of Agreement</u>. This Agreement constitutes a fully negotiated agreement among commercially sophisticated Parties and therefore shall not be construed or interpreted for or against any Party. The Parties agree that California Civil Code section 1654 shall not apply to the terms of this Agreement.

11.7 <u>Attorneys' Fees and Costs</u>. If any of the Parties hereto commences any action to enforce, interpret or challenge the terms of this Agreement, then each of the Parties hereto agrees that the prevailing party in any such action shall be entitled to recover his attorneys' fees and court costs, and other non-reimbursable litigation expenses, including expert witness fees and attorney and witness travel expenses, and including all attorneys' fees and costs incurred in enforcing any judgment or in collecting upon any amounts that may be awarded in any such action.

11.8 <u>Notices</u>. All notices, requests and other communications required or permitted hereunder shall be in writing (which shall include communications by email); shall be deemed to have been given when delivered by hand, overnight delivery service, with acknowledged receipt, email, or when deposited in the United States mail if sent by registered or certified mail, postage prepaid, return receipt requested, addressed to a Party at the addresses set forth below:

If to Seller:        Richard M Kipperman
                     P.O. Box 3010
                     La Mesa, CA 91944
                     Email: rmk@corpmgt.com

With a copy to:      Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

-17-

79356564v.4

3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Attention: Abigail V. O'Brient
Email: avobrient@mintz.com

.f to Buyer:  DD Axiom Resources, LLC
Attn: Deborah Wilson
2323 San Juan Road
San Diego, CA 92103
Email: axiomdevco@sbcglobal.net

With a copy to:  Sullivan Lawyers
2468 Historic Decatur Road, Suite 140
San Diego, CA 92106
Attn: Leo Sullivan
lsullivan@sullivanlawyers.com

11.9   Further Documents. The Parties agree to promptly perform such further acts and to execute and deliver any and all further documents that may reasonably be necessary or desirable to effectuate the purpose of this Agreement and the transactions contemplated hereby.

11.10   Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law of any jurisdiction or any rule or regulation of any governmental authority, such invalidity shall not impair the operation of or affect those provisions in any other jurisdiction or any other provisions hereof which are valid.

11.11   Third Parties. Nothing herein shall be construed to be for the benefit of or enforceable by any third party.

11.12   Assignment. This Agreement may not be assigned by either Party without the prior written consent of the other Party.

11.13   Headings. Captions and headings used in the Agreement are for ease of reference only and do not constitute a part of this Agreement.

11.14   Counterparts. This Agreement may be executed in any number of counterparts, all of which shall constitute one in the same instrument, and any Party hereto may execute this Agreement by signing one or more counterparts.

11.15   Time of the Essence. Time is strictly of the essence in this Agreement.

IN WITNESS WHEREOF, this Agreement is executed as of the date set forth above.

SELLER:  BUYER:

LIVE OAK HOLDING, LLC  DD AXIOM RESOURCES, LLC

-18-

793565-4v.4

By: Richard M Kipperman, chapter 11 trustee

By: Deborah Sutton Wilson
Its:  Managing Member

-19-

**EXHIBIT A**
**QUITCLAIM DEED**

RECORDING REQUESTED BY:


WHEN RECORDED MAIL DEED
AND TAX STATEMENTS TO:

DD Axiom Resources LLC
2323 San Juan Road
San Diego, CA 92103

---

APN:    609-050-03-00, 609-050-06-00, 609-086-03-00,         Space above this line for Recorder's use only
        609-071-01-00, and 609-090-07-00

| THE UNDERSIGNED GRANTOR(s) DECLARE(s) | Documentary Transfer Tax is $192.50. |
|---|---|
| ☐ City of | ☑ computed on full value of interest or property conveyed, or |
| ☑ Unincorporated area | ☐ computed full value less value of liens or encumbrances remaining at the time of sale |

## QUITCLAIM DEED

      FOR GOOD AND VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, RICHARD M KIPPERMAN, as Chapter 11 Trustee of Live Oak Holding, LLC, a Nevada limited liability corporation, debtor in Case No. 13-11672-LT11, pending in the United States Bankruptcy Court for the Southern District of California ("**Grantor**"), hereby QUITCLAIMS AND CONVEYS to DD AXIOM RESOURCES LLC, a California limited liability company ("**Grantee**"), those certain parcels of real property located in the County of San Diego, State of California, as more specifically described on <u>Exhibit A</u> attached hereto and made a part hereof, and subject to all matters of record and all matters discoverable by inspection or survey.

      Dated this _____ day of _____, 2019.


**GRANTOR:**


**LIVE OAK HOLDING, LLC**
a Nevada limited liability corporation


By:_____
Richard M Kipperman
Chapter 11 Trustee for Live Oak Holding, LLC,
a Nevada limited liability corporation

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA     )
                        )
COUNTY OF SAN DIEGO   )

On _____ before me, _____, a notary public, personally appeared RICHARD M KIPPERMAN, as Chapter 11 Trustee for Live Oak Holding, LLC, a Nevada limited liability corporation, who proved to me on the basis of satisfactory evidence to be the person(s)whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s)on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____ (seal)

**EXHIBIT B**
**BILL OF SALE**

-21-

## BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made and entered into as of this __ day of _____, 2019 by and between Richard M Kipperman, the Chapter 11 Trustee of Live Oak Holding, LLC, a Nevada limited liability company ("**Seller**"), and DD Axiom Resources LLC, a California limited liability company ("**Buyer**").  Buyer and Seller are collectively referred to herein as the "Parties" and individually as a "Party".

WHEREAS, this Bill of Sale is made and entered into in connection with the Closing of the transactions contemplated by that certain Agreement for Purchase and Sale of Assets dated as of September 24, 2018 (the "Asset Purchase Agreement"), by and among the Parties;

WHEREAS, Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement, the Assets;

WHEREAS, the execution and delivery of this Bill of Sale is required by Section 4.3 of the Asset Purchase Agreement; and

WHEREAS, this Bill of Sale, as duly executed by each Party, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties do hereby agree as follows:

1.      Definitions. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Asset Purchase Agreement.

2.      Transfer of Purchased Assets.  Seller hereby sells, transfers, assigns, conveys, grants and delivers to Buyer all of Seller's right, title to and interest in all of the Assets, free and clear of liens, encumbrances or interests of any nature whatsoever, including all liens related to real property taxes, with such Assets being sold, transferred, assigned, conveyed, granted and delivered to Buyer.  The Assets include the following:

(a)      The Water Company, defined in the Asset Purchase Agreement as Live Oak Springs Water Company, a Class D water utility providing public utility water service to approximately one hundred customers in San Diego County and occupying the Real Property described in (b) below;

(b)      The Real Property, defined as approximately 27 acres of real property located at 37820 Old Highway 80, Boulevard, California with APNs 609-050-03-00, 609-050-06-00, 609-086-03- 00, 609-071-01-00, and 609-090-07-00; and

(c)      The improvements on the Real Property (including groundwater wells and three 20,000 gallon water storage tanks), and all assets owned by the Water Company and/or owned by the Debtor and used by the Water Company, including,

but not limited to, any and all machinery, equipment, hardware, materials, fixtures, trade fixtures, storage units, vehicles, tools, and books and records, including the information necessary to provide service to the Customers.

3.    <u>Terms of Asset Purchase Agreement</u>.  This Bill of Sale is executed and delivered pursuant to the Asset Purchase Agreement.  In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Asset Purchase Agreement.

4.    <u>Governing Law</u>.  This Bill of Sale shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of California (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.

5.    <u>Successors and Assigns</u>.  This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

6.    <u>Closing Date</u>.  This Bill of Sale is to be effective as of the Closing Date.

7.    <u>Counterparts</u>.  This Bill of Sale may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when counterparts have been signed by each party and delivered to each other party.  In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

8.    <u>Severability; Amendment</u>.  Any provision in this Bill of Sale which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.  This Bill of Sale may not be amended except by execution and delivery of an instrument in writing signed by officers of Seller and Purchaser on behalf of Seller and Purchaser.

9.    <u>Notices</u>.  Any notice given pursuant to this Bill of Sale shall be given in the same manner as stated in Section 11.8 of the Asset Purchase Agreement.

10.    <u>Seller</u>.  Seller is Richard M Kipperman, the Chapter 11 Trustee of Live Oak Holding, LLC, a Nevada limited liability company (sometimes dba Live Oak Enterprises, LLC, Live Oak Springs Water Company, and/or Live Oak Springs Water and Power Company), and by this Bill of Sale Seller sells, transfers, assigns, conveys, grants and delivers to Buyer all of Seller's right, title to and interest in all of the Assets owned by any and all such entities as set forth in the Asset Purchase Agreement.

*[The remainder of this page is intentionally left blank.]*

2

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale to be executed as of the date first set forth above.

SELLER:

LIVE OAK HOLDING, LLC
a Nevada limited liability company

Sometimes dba Live Oak Enterprises, LLC,
Live Oak Springs Water Company, and/or
Live Oak Springs Water and Power Company


By:    _____
          Richard M Kipperman
          Chapter 11 Trustee


BUYER:

DD AXIOM RESOURCES LLC
a California limited liability company


By:    _____
          Deborah Wilson
          Manager

# EXHIBIT 2

## AMENDMENT TO AGREEMENT
## FOR PURCHASE AND SALE OF ASSETS

This Amendment to Agreement for Purchase and Sale of Assets ("**Amendment**") is made and entered into this 14th day of December 2018 by and between Richard M Kipperman, the chapter 11 trustee of Live Oak Holding, LLC, a Nevada limited liability corporation ("**Seller**"), and DD Axiom Resources LLC, a California limited liability company ("**Buyer**"). Seller and Buyer are referred to, collectively, as "**Parties**."

### RECITALS

A.    Richard M. Kipperman is the chapter 11 Trustee of Live Oak Holding, LLC, the debtor ("**Debtor**") in Case No. 13-11672-LT11, which is pending in the United States Bankruptcy Court for the Southern District of California.

B.    Debtor owns Live Oak Springs Water Company, a Class D water utility providing public utility water service to approximately one hundred customers in San Diego County (the "**Water Company**") and occupying approximately 27 acres of real property located at 37820 Old Highway 80, Boulevard, California with APNs 609-050-03-00, 609-050-06-00, 609-086-03-00, 609-071-01-00, and 609-090-07-00 (the "**Real Property**").

C.    On September 24, 2018, Seller and Buyer entered into that certain Agreement for Purchase and Sale of Assets ("APA") pursuant to which Seller agreed to sell and Buyer agreed to purchase the Water Company, the Real Property and the improvements thereon, and certain other assets pursuant to the terms and conditions set forth in the APA (collectively, the "**Assets**").

D.    On November 30, 2018, Seller and Buyer entered into that certain Agreement to Extend Diligence Period pursuant to which the Parties extended the Diligence Period to and including December 7, 2018.

E.    The Parties now desire to adjust the Purchase Price to account for certain discrepancies regarding a water well and related equipment.

### AGREEMENT

NOW THEREFORE, in consideration of the mutual representations, covenants and promises set forth herein, the Parties hereby agree as follows:

1.    Definitions. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the APA.

2.    Termination of Diligence Period. The Parties acknowledge that the Diligence Period has expired, that Buyer has elected to proceed with the purchase of the Assets, and that, pursuant to Section 2.3(b) of the APA, Buyer is deemed to have satisfied itself as to the condition of the Assets.

3.    Purchase Price. Section 3.1 of the APA is amended to reduce the Purchase Price from $175,000.00 to $150,000.00, or such greater amount as Buyer may bid at the Auction.

1

7606/7058.002

4.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, all of which shall constitute one in the same instrument, and any party hereto may execute this Amendment by signing one or more counterparts.  Emailed, faxed and other electronic signatures hereto shall be deemed original signatures for all purposes.

5.    <u>Other Provisions of APA Not Modified</u>.  Except as specifically amended hereby, the APA shall remain in full force and effect as in existence on the date hereof, and any reference to the APA shall mean the APA as modified hereby.  Terms used herein with an initial capital letter shall have the meanings given them in the APA.

IN WITNESS WHEREOF, this Amendment is executed as of the date set forth above.

SELLER:                                        BUYER:

LIVE OAK HOLDING, LLC                DD AXIOM RESOURCES, LLC

_____      _____

By: Richard M Kipperman, chapter 11 trustee    By:  Deborah Sutton Wilson
                                                                  Its:  Managing Member

2

4.    Counterparts.  This Amendment may be executed in any number of counterparts, all of which shall constitute one in the same instrument, and any party hereto may execute this Amendment by signing one or more counterparts.  Emailed, faxed and other electronic signatures hereto shall be deemed original signatures for all purposes.

5.    Other Provisions of APA Not Modified.  Except as specifically amended hereby, the APA shall remain in full force and effect as in existence on the date hereof, and any reference to the APA shall mean the APA as modified hereby.  Terms used herein with an initial capital letter shall have the meanings given them in the APA.

IN WITNESS WHEREOF, this Amendment is executed as of the date set forth above.

SELLER:                                         BUYER:

LIVE OAK HOLDING, LLC              DD AXIOM RESOURCES, LLC

_____       _____
By: Richard M Kipperman, chapter 11 trustee    By:  Deborah Sutton Wilson
                                                Its:  Managing Member

2